UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80358-CIV-MARRA/JOHNSON

TERRY KLEIN, derivatively on behalf of
BLUEGREEN CORPORATION,

Plaintiff,

vs.

CENTRAL FLORIDA INVESTMENTS, INC.,
DAVID A. SIEGEL REVOCABLE TRUST,
DAVID A. SIEGEL and BLUEGREEN
CORPORATION,

Defendants.
_____/

**OPINION AND ORDER**

This cause is before the Court upon Plaintiff's Motion for Partial Summary Judgment (DE 27). The motion is fully briefed and ripe for review. The Court held oral argument on the motion on June 18, 2009. The Court has carefully considered the motion and is otherwise fully advised in the premises.

I.  Background

The undisputed facts are as follows:[1]

Plaintiff Terry Klein is a New York resident who is the owner of Bluegreen common stock and has been the owner of Bluegreen common stock at all relevant times. (Terry Klein Aff. ¶ 2, Ex. A, DE 27.) Bluegreen, a nominal defendant herein, is a Massachusetts corporation with its principal place of business in Boca Raton, Florida. (Def. Answer ¶ 2.) Defendant Central

---

[1] At oral argument, the parties informed the Court that the facts are undisputed and the Court may rule, as a matter of law, on the issue of Defendants' liability.

Florida Investments, Inc. ("CFI") is a Florida corporation. Defendant David A. Siegel Revocable Trust (the "Siegel Trust") is a revocable trust established by defendant David A. Siegel ("Siegel"). The Siegel Trust owns 100% of the voting shares of CFI. Siegel is the President and sole director of CFI and the sole trustee of the Siegel Trust.  All of the defendants operate out of the same business address in Orlando, Florida. (Def. Answer ¶ 2.)

Starting in 2001, CFI began acquiring stock in Bluegreen. (David Crabtree Aff. ¶ 3, Ex. A, DE 41.)  CFI initially acquired shares of Bluegreen's common stock on the open market and then by writing and selling put options. (Crabtree Aff. ¶ 4.)  Before it began writing put option contracts, CFI's interests in Bluegreen did not require disclosure under applicable federal securities laws. (Crabtree Aff. ¶ 5.)  However, as a consequence of CFI's purchase of Bluegreen stock by virtue of the exercise of puts by other owners of Bluegreen stock, on July 10, 2006, CFI's holdings increased to 2,349,800 shares, representing 7.7% of the outstanding common stock of Bluegreen. (Crabtree Aff. ¶ 6.)

Because by July 20, 2006 it had for the first time passed the 5% disclosure threshold, CFI timely filed a Section 13D with the Securities and Exchange Commission ("SEC") disclosing its holdings.  This filing was timely amended on August 9, 2006 and again on August 22, 2006, to reflect the additional shares of CFI purchased as the put contracts it wrote were exercised. (Crabtree Aff. ¶ 7.)

On July 27, 2006, the Bluegreen Board adopted a Shareholders' Rights Plan (the "Poison Pill") targeting CFI, the effect of which, if implemented would be to greatly dilute CFI's proportionate interest in Bluegreen. (Bluegreen Corporation Form 8-K, Ex. B., DE 41.)

The essence of the Poison Pill is that it:

[I]mpose[s] a significant penalty upon any person or group which acquires beneficial ownership of 15% or more of the Company's outstanding common stock without the prior approval of the Board of Directors. (Bluegreen Corporation Form 8-K.)

The Poison Pill was designed to apply only to CFI, inasmuch as it exempted out:

The Company, its subsidiaries, employee benefit plans of the Company or any of its subsidiaries, and any entity holding common stock for or pursuant to the terms of any such employee benefit plan will be excepted, as well as Levitt Corporation, its affiliates, successors and assigns. (Bluegreen Corporation Form 8-K.)

The Poison Pill specified its purpose:

The Board of Directors is taking this action in response to the filing on July 20, 2006 of a Schedule 13D with the Securities and Exchange Commission disclosing that David A. Siegel, individually, through the David A. Siegal Revocable Trust and through a company he controls, Central Florida Investments, Inc., recently acquired approximately 2,349,800 shares of the Company's common stock. Additionally, Mr. Siegel and his affiliates disclosed that they have sold put contracts with varying expiration dates which, if exercised in full, could result in Mr. Siegel and his affiliates owning 9,791,900 shares, or approximately 32.1% of the Company's common stock. (Bluegreen Corporation, Form 8-K.)

The Poison Pill was triggered if CFI became the beneficial owner of 15% or more of the outstanding Bluegreen stock. At such time the company granted all shareholders, other than CFI, the right to purchase additional shares of Bluegreen common stock at 50% of the then current market price. If the rights were exercised, it would effectuate a substantial dilution of CFI's dilution in Bluegreen. (Bluegreen Corporation Form 8-K.) At this time, shares of Bluegreen stock were trading at around $11.86, while the put options CFI wrote required that CFI pay $12.50 per share. (Crabtree Aff. ¶ 8.)

Also on July 27, 2006, Bluegreen issued the following press release: "The Board of Directors is taking this action in response to the recent filing of a Schedule 13D with the Securities and Exchange Commission disclosing that David A. Siegel, individually, and through a company he

3

controls, [CFI] recently acquired approximately 2,349,800 shares of the Company's common stock." (Bluegreen Corporation Form 8-K; Bluegreen Press Release, Exhibit 99.1, Ex. C, DE 41.)

The Poison Pill, when triggered, diluted only CFI's ownership interest while allowing all other shareholders to effectively double their holdings at a bargain basement price. (Bluegreen Corporation Form 8-K.) The Poison Pill did not affect the holdings of Levitt Corp., a publicly-traded corporation that is the largest holder of Bluegreen stock and which, at that time, held 31% of Bluegreen's common stock or 9.5 million shares. (Bluegreen Corporation Form 8-K.) Once the Poison Pill was triggered, namely, when CFI acquired a 15% interest in Bluegreen, the only way CFI could avoid the Poison Pill's automatic dilution was by divesting itself of approximately 5 million shares within sixty days. (Bluegreen Corporation Form 8-K.)

Thereafter, additional shares were put to CFI, bringing CFI's total holdings in Bluegreen to 9,632,400 shares, or approximately 31.57% of Bluegreen's stock. (Crabtree Aff. ¶ 9.) Since these shares were obtained by CFI as a result of puts that existed and were in the open market when the Poison Pill was adopted, effectively the poison pill was already triggered when it was adopted. (Bluegreen Corporation Form 8-K.) CFI did not receive advance notice of the Poison Pill and, since CFI could not control the exercise of the puts it had written, CFI could not avoid triggering it. (Crabtree Aff ¶ 10.)

The same day it adopted the Poison Pill, Bluegreen also sued CFI in the United States District Court for the Southern District of Florida. (the "Bluegreen Litigation"). (Complaint in Bluegreen Corporation v. David A. Siegel, David A. Siegel Revocable Trust and Central Florida Investments, Inc., United States District Court for the Southern District of Florida Case No. 06-80718, Ex. D, DE 41.) Bluegreen sued CFI under three theories: (1) alleged violations of Section 13(d) of the

4

Exchange Act; (2) alleged violations of the Florida Securities and Investor Protection Act; and (3) declaratory judgment to confirm that Bluegreen's Board of Directors was justified in adopting the Poison Pill. (Id.)

Thereafter, CFI answered the complaint, asserted defenses and filed a counterclaim. The counterclaim sought declaratory relief that the Poison Pill was invalid for, among other reasons, that the board of Bluegreen breached its fiduciary duty at the time that the Poison Pill was enacted and that the Poison Pill unconstitutionally impaired CFI's then existing contract rights with the numerous holders of the puts CFI wrote. (Answer and Affirmative Defenses by David A. Siegel, David A. Siegel Revocable Trust and Central Florida Investments, Inc. and Counterclaim by David A. Siegel, David A. Siegel Revocable Trust and Central Florida Investments, Inc, Ex. E & F, DE 41.)

On August 24, 2006, CFI filed its Motion for a Temporary Restraining Order and Preliminary Injunction to prevent Bluegreen from enforcing the Poison Pill against CFI. (Emergency Motion for Temporary Restraining Order and Preliminary Injunction by David A. Siegel, David A. Siegel Revocable Trust and Central Florida Investments, Inc., Ex. G, Ex. 41.) Thereafter, the parties engaged in an accelerated discovery period, with depositions and paper discovery conducted on several concurrent tracks. (Bluegreen Litigation Docket, Ex. H, DE 41.) Following a hearing, on September 29, 2006, Magistrate Judge Barry S. Seltzer issued his Report and Recommendation, recommending that CFI's Motion for Temporary Restraining Order and Motion for Preliminary Injunction be denied. (Report and Recommendations of Magistrate Barry S. Seltzer, Ex. I, DE 41.) On October 12, 2006, Judge Daniel T.K. Hurley adopted the recommendations of Magistrate Judge Seltzer and denied CFI's Motion. The Poison Pill was triggered. (Order Denying Motion for Temporary Restraining Order, Denying Motion for Preliminary Injunction, adopting Report and

Recommendations, Ex. J, DE 41.)

On October 16, 2006, CFI and Bluegreen settled the litigation. (Stipulation and Order dated October 16, 2006, Ex. K, DE 41.) The Stipulation prohibited CFI from acquiring additional Bluegreen stock, and instead required that it immediately begin divesting itself of Bluegreen stock. (Stipulation and Order §§ 1 (a) & 2(b)).

Even though the pace of divestiture required that CFI offer its shares for sale in lots, often multiples of Bluegreen's average daily volume and potentially flooding the market for Bluegreen stock, CFI was still required to divest itself of all of its over nine million Bluegreen shares. (Stipulation and Order §1(a)).

As part of the Settlement, CFI could not vote its stock:

> Until such time as the Shareholders have divested all of their shares of Common Stock as required by Section 1(a), the Shareholders shall vote all shares of Common Stock beneficially owned by them, and shall cause their respective affiliates to vote all shares of Common Stock owned by such affiliates, as recommended by the board of directors of the Company on all matters of any kind or nature submitted to a vote of the Company's shareholders.

(Stipulation and Order § 2(a)).

Norman Becker and Arnold Sevell, two of Bluegreen's then existing directors, were appointed as CFI's irrevocable proxy and attorneys-in-fact with the full voting power of CFI through the time that CFI divested itself of its Bluegreen shares. Becker and Sevell could vote CFI's stock, not CFI. (Stipulation and Order § 2(b).)

CFI was prohibited from seeking to control or influence Bluegreen's management or Board of Directors. (Stipulation and Order § 3(a)(iii).) CFI was denied any role in Bluegreen's corporate governance, meaning:

6

    (a)    CFI could not attend Board of Directors meetings;

    (b)    CFI could not attend shareholders meetings; and

    (c)    CFI could not receive information about the affairs, operations, or financial position of Bluegreen which would otherwise be known by Bluegreen's board of directors, management and/or employees, and, under more orthodox circumstances, by Leavitt Corp., Bluegreen's co-31% shareholder. (Crabtree Aff. ¶ 11).

CFI could not "engage in any transaction involving 'derivative securities.'" (Stipulation and Order § 1(b)).  CFI could sell Bluegreen stock by writing call contacts: CFI "may engage in the sale of up to 915,379 shares of Common Stock pursuant to call option transactions by [CFI] which comply with the manner of sale requirements of Rule 144(f)."  (Stipulation and Order § 1(b)).

Between October 16, 2006 and July 16, 2007, CFI entered into 65 transactions by which it wrote call options for Bluegreen stock.  Each of those call options expired within six months from the date it was written and CFI received total premiums in the amount of $869,956.50. (Def Answer ¶ 7.)

At all relevant times, when each of the transactions described above was made, CFI owned more than a 10% beneficial interest in Bluegreen common stock.  (Amendment No. 4 to Schedule 13D filed by Defendants on October 17, 2006 at 2, Ex. E, DE 27; Amendment No. 5 to Schedule 13D filed by Defendants on February 15, 2007 at.2, Ex. F, DE 27;  Amendment No. 6 to Schedule 13D filed by Defendants on May 22, 2007 at 2, Ex. G, DE 27;  Amendment No. 7 to Schedule 13D filed by Defendants on October 19, 2007 at 2, Ex. H, DE 27.)

When CFI wrote the call options, it explicitly denied having any information about Bluegreen not already disclosed to the public. (Crabtree Aff. ¶ 12.)

II. The Parties' Arguments

Plaintiff seeks partial summary judgment under Section 16(b) of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78p(b), for disgorgement of profits realized by Defendants from trading in Bluegreen Corporation equity securities.  Plaintiff claims that CFI was a statutory insider of Bluegreen by virtue of its beneficial ownership of more than 10% of Bluegreen's common stock.  Plaintiff further claims that CFI entered into 65 transactions by which it wrote call options for Bluegreen stock which expired within six months from the date it was written.

Defendants do not dispute that CFI was an insider or that it engaged in the 65 transactions at issue.  Instead, Defendants claim that the unorthodox transaction exception to section 16(b) applies.  In support, Defendants state that Bluegreen targeted CFI with a poison pill, which led to litigation and a subsequent settlement resulting in CFI divesting itself of shares of Bluegreen stock and losing its rights as a shareholder in the company.  Furthermore, Defendants point out that CFI wrote call options as an attempt to mitigate against losses from the sale of its Bluegreen stock.

III. Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is

unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

9

IV.  Discussion

Section 16(b) of the Exchange Act precludes corporate insiders from making short-swing profits from transactions in the corporation's equity securities.  An insider is defined as "[e]very person who is directly or indirectly the beneficial owner or more than ten per centum of any class of any equity security . . . which is registered pursuant to section 12 . . . or who is a director or an officer of the issuer of such security." 15 U.S.C. § 78p(a).

Section 16(b) also provides, in pertinent part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. . . .

15 U.S.C. § 78p(b).

"To ensure that section 16(b) efficaciously put an end to unfair inside trading, Congress explicitly did not condition the section's application on proof of an insider's intent to trade on a short swing."  Gund v. First Florida Banks, Inc., 726 F.2d 682, 686 (11th Cir. 1984); Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 594 (1973) ("the evil which Congress sought to prevent [was] the realization of short-swing profits based upon access to inside information").  "In short, this statute imposes liability without fault within its narrowly drawn limits." Gund, 726 F.2d at 686 quoting Foremost-McKesson, Inc. v. Provident Securities Co., 423 U.S. 232, 251 (1976).  Put another way, "[s]ection 16(b) operates mechanically, and makes no moral distinctions, penalizing

technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition. 'Such is the price of easy administration.'" Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 320-21 (2d Cir. 1998) (citations omitted).

That stated, in Kern, the United States Supreme Court created an exception to section 16(b) for "unorthodox" transactions. Kern, 411 U.S. at 593. In that case, the defendant, Occidental, unsuccessfully sought to merge with Old Kern, the predecessor of the plaintiff. When that offer was rebuffed, Occidental made a tender offer for 500,000 shares, or more than 10% of the outstanding shares, of Old Kern, and then expanded its offer to include an additional 500,000 shares. The president of Old Kern advised all the shareholders against the tender offer and undertook merger discussions with Tenneco, Inc. Subsequently, the boards of Old Kern and Tenneco approved a defensive merger whereby the shareholders of Old Kern received one share of Tenneco stock for each share of Old Kern that they owned. Thus, all Old Kern shareholders, including Occidental, had to accept securities of Tenneco in exchange for Old Kern securities. Following completion of the merger, Old Kern's successor sued Occidental for buying and disposing of securities within a six-month period.

In ruling that 16(b) liability did not attach to Occidental's sale of stock, the Kern Court stated that the nature of the exchange was "involuntary" and there was an "absence of the possibility of speculative abuse of inside information." Id. at 600. Specifically, Kern noted that "[o]nce agreement between these two companies crystallized, the course of subsequent events was out of Occidental's hands." Id. Furthermore, given that Occidental acted in an adversarial relationship to Old Kern's management, it did not have access to inside information. Id.

As noted by the Eleventh Circuit in Gund, the "vast majority" of unorthodox transaction

11

exception cases involve "involuntary transactions which are triggered by a corporate reorganization." Gund, 726 F.2d at 686 citing Kern, 411 U.S. at 593-95 (sales in context of blocked tender offer outside of section 16(b) prohibitions); Heublein, Inc. v. General Cinema Corp., 722 F.2d 29 at 30-31 (2d Cir.1983) (involuntary exchange of stock by statutory insider for shares in the survivor of a corporate merger not prohibited by section 16(b)); Texas International Airlines v. National Airlines, Inc., 714 F.2d 533 (5th Cir. 1983) (narrow "unorthodox transaction" exception to absolute liability in hostile takeover context inapplicable where putative insider voluntarily made cash-for-stock sale within statutory six-month period); Kay v. Scientex Corp., 719 F.2d 1009 (9th Cir. 1983) (overissuance of stock by corporation to insider considered a purchase under section 16(b) since parties voluntarily engaged in short-swing sale).  Furthermore, the Eleventh Circuit later distinguished the cases discussed in Gund from a factual scenario in which "a corporate officer and director facing defeat in a tender offer battle voluntarily tender[s] his stock to his opponents for cash." Super Stores Inc. v. Reiner, 737 F.2d 962, 965 (11th Cir. 1984).  In comparing those facts to Kern, the Court stated that "nothing in Kern creates an exception for such a transaction from the short-swing profit prohibitions of § 16(b)." Id.

Based on the undisputed facts, the Court finds that the unorthodox transaction exception carved out in Kern does not apply in the instant case.  To begin, this is not a defensive merger context. See American Standard, Inc. v. Crane Co., 510 F.2d 1043, 1053 (2d Cir. 1974) ("Kern County holds the defensive merger situation to be sui generis in terms of § 16(b) liability"). Nor are there other factors that give rise to a finding of involuntariness.  For example, as opposed to a defensive merger, CFI agreed to enter into a settlement agreement with Bluegreen.  By its very nature, settlement is a voluntary act.  Furthermore, as part of the settlement agreement, CFI agreed

12

to dispose of its stock and the agreement was structured to allow CFI to dispose of its stock without violating section 16(b). Nor is there any record evidence suggesting that the call options could not have been structured to avoid liability; i.e., to expire in six months and one day. In fact, the call options had all the hallmarks of a voluntary act, as evidenced by the economic benefit of the premium received for writing the option. Furthermore, during the oral argument, CFI acknowledged that it could have structured the call options to avoid violating section 16(b). Therefore, the Court analogizes the voluntary nature of CFI's acts to the facts of Super Stores. In Super Stores the corporate officer and director voluntarily tendered the stock to the corporation. In the instant case, CFI voluntarily tendered its securities to the marketplace. The Court concludes that there is not a material difference between the facts in Super Stores and the facts in this case. Thus, the holding of Super Stores controls.

At the crux of this case are the voluntary economic choices CFI made in response to the poison pill and the events that emanated from it; e.g., the settlement agreement. Events such as these are part and parcel of the risks that are assumed by one involved in the securities marketplace. At times, certain events will materialize that will affect the economic viability of an investment and present difficult business decisions. Such economic choices, however, differ from the involuntary decision presented in Kern. For that reason, the Court finds that the unorthodox transaction exception to section 16(b) liability does not apply.[2]

Finally, with the respect to Plaintiff's request for prejudgment interest, the Court notes that the "allowance of interest is within the discretion of the trial court" and that "[a]mong the factors to

---

[2] The parties do not dispute that CFI was a statutory insider by virtue of its ownership of more than 10% of Bluegreen stock. At the same time, the parties do not dispute that CFI did not possess material information about Bluegreen.

13

be considered in weighing the equities is whether the insider acted innocently or knowingly,'"[t]he type and degree of the insider's inadvertence, the position of the insider in the corporation, and other circumstances of each case." <u>Whittaker v. Whittaker Corp.</u>, 639 F.2d 516, 533 (9th Cir. 1981). The Court requests that the parties inform the Court whether further development of the record is necessary before the Court makes a determination on the request for prejudgment interest. Thus, the Court defers ruling on this issue at this time.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Partial Summary Judgment (DE 27) is **GRANTED IN PART AND DENIED IN PART**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 12th day of August, 2009.

KENNETH A. MARRA
United States District Judge